# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

SHANESVILLE INVESTMENTS
LLC, *et al.*,

     Plaintiffs,

  **v.**

ECLIPSE RESOURCES I, LP,


     Defendant.

**Case No. 2:18-cv-237**
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Elizabeth P. Deavers**

## OPINION AND ORDER

   This matter is before the Court on the parties' cross motions for partial summary judgment. Defendant Eclipse Resources, I, LP ("Defendant") moves for summary judgment against Plaintiffs Shanesville Investments LLC and Graber Land LLC ("Plaintiffs") regarding the interpretation of a lease agreement between the parties. (ECF No. 20). In turn, Plaintiffs seek partial summary judgment against Defendant in favor of their lease interpretation. (ECF No. 22). For the reasons that follow, the Court **GRANTS** Defendant's motion (ECF No. 20) and **DENIES** Plaintiffs' motion (ECF No. 22).

## I.

### A. Factual Background

   Plaintiffs are successors in interest to an oil and gas lease between Robert and Elizabeth Savage (collectively "Savages") and Anschutz Exploration Corporation ("Anschutz"). (Exhibit A, ECF No. 3-1). Plaintiff Shanesville Investments LLC ("Shanesville") owns a 72.355-acre property in Oxford Township, Guernsey County. (Exhibit B, ECF No. 3-2). Plaintiff Graber Land LLC ("Graber") owns 70.231 acres adjacent to Shanesville's property. (Exhibit C, ECF No. 3-3).

In 2008, the Savages signed a lease with Anschutz. (Exhibit A). In 2014, as successors in interest to the Savages, Plaintiffs signed identical amendments to the lease with Anschutz's successors in interest, Chesapeake Exploration, LLC ("Chesapeake"); CHK Utica, LLC ("CHK"); and Total E&P USA, Inc. ("Total"). (Exhibits D, ECF No. 3-4; Exhibit F, ECF No. 3-6). The amendments will be referred to as the "Shanesville Amendment" (Exhibit D) and the "Graber Amendment" (Exhibit F).

The parties to the amendments recorded memoranda on January 22, 2015, which will be referred to as "1st Shanesville Memorandum" (Exhibit E, ECF No. 3-5) and "1st Graber Memorandum" (Exhibit G, ECF No. 3-7). Plaintiffs, Chesapeake, CHK, and Total recorded subsequent memoranda on March 12, 2015, adding Total's signature. (Exhibit H, ECF No. 3-8; Exhibit I, ECF No. 3-9). The subsequent memoranda were titled "2nd Shanesville Memorandum" (Exhibit H) and "2nd Graber Memorandum (Exhibit I). Collectively, the Court will refer to the lease, lease amendments, 1st lease memoranda, and 2nd lease memoranda as the "Amended Lease."

## B. Procedural History

On March 21, 2018, Plaintiffs initiated this lawsuit, alleging breach of contract and seeking a declaratory judgment. (Pls.' Compl., ECF No. 3).[1] First, Plaintiffs assert that Defendant breached the express terms of the Amended Lease by improperly deducting expenses before calculating Plaintiffs' royalty payments. (Pls.' Compl. ¶¶ 75–91). Specifically, Plaintiffs argue that Defendant sold extracted wellhead product to unaffiliated third parties for processing and

---

[1] Plaintiffs identify Defendant as the successor in interest to Chesapeake, CHK, and Total under the Amended Lease. (Pl.'s Compl. ¶ 3). Defendant does not dispute it is bound by "an oil and gas lease and a lease amendment between the parties." (Def.'s Mot. for Summ. J. at 1, ECF No. 21). Moreover, Defendant admits it extracts raw oil and natural gas from Plaintiffs' leased premises. (Defs.' Answer ¶ 20, ECF No. 14).

subsequently deducted the costs of this processing from their royalty payments to Plaintiffs. (*Id.* ¶¶ 21–25). Plaintiffs contend this net cost calculation resulted in smaller royalty payments, preventing Plaintiffs from "enjoying the full benefits of their minerals and rights" under the Amended Lease. (*Id.* ¶ 30). According to Plaintiffs, Defendant continues "to improperly deduct costs from the royalty payments," despite previously refunding a portion of the deducted costs. (*Id.* ¶ 34).

Second, Plaintiffs seek a declaratory judgment that Defendant is not entitled to make deductions from gross proceed royalty payments. (*Id.* ¶ 94). In its Answer, Defendant denies that it underpaid royalties to Plaintiffs. (Def.'s Answer ¶ 4). Defendant asserts a counterclaim for declaratory judgment, arguing that its current calculation of royalties is proper under the Amended Lease. (*Id.* ¶ 11).

On September 7, 2018, Defendant moved for partial summary judgment in favor of its interpretation of royalty calculations under the Amended Lease. (ECF No. 20). That same day, Plaintiffs filed a cross motion for partial summary judgment on the interpretation of royalty calculations. (ECF No. 22). The parties filed simultaneous responses in opposition (ECF Nos. 24 and 25) and reply briefs (ECF Nos. 29 and 30). The parties' cross motions for partial summary judgment are ripe for review.

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling*

3

*Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

### III.

#### A. Rules of Contract Construction

The parties agree that Ohio law controls the instant action. Defendant analyzes the Amended Lease under Ohio law in its Motion for Summary Judgment. (Def.'s Mot. for Summ. J. at 4). In addition, Plaintiffs correctly note that "Ohio follows the rule that where a conflict of law arises in a case involving a contract, the law of the state where the contract is to be performed governs." *Schulke Radio Prods., Ltd. v. Midwestern Broadcasting Co.*, 6 Ohio St.3d 436, 438–439 (1983). Here, the contract is a lease agreement to be performed in Guernsey County, Ohio. Accordingly, Ohio law governs.

Defendant accurately states that "[i]n Ohio, an oil and gas lease is no different than any other contract." (Def.'s Mot. for Summ. J. at 4) (citing *Philips Exploration, Inc. v. Reitz*, 2012

WL 6594915, at *3 (S.D. Ohio, Dec. 18, 2012) (in Ohio, "[a]n oil and gas lease is a contract subject to traditional rules of interpretation and construction"). *See also Benzel v. Chesapeake Exploration, LLC*, 2014 WL 4915566, at *4 (S.D. Ohio, Sept. 30, 2014) ("Under Ohio law . . . oil and gas leases are contracts subject to the well settled rules of contract construction and interpretation").

Under Ohio law, the interpretation of written contract terms "is a matter of law for initial determination by the court." *Absalom v. Hess Corp.*, 2014 WL 12746847, at *3 (S.D. Ohio Jan. 2, 2014). *See also Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (applying Ohio law); *Inland Refuse Transfer Co. v. Browning-Ferris Industry of Ohio, Inc.*, 15 Ohio St.3d 231 (1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of the contract, factual determination of intent or reasonableness may be necessary to supply the missing term").

When confronting an issue of contract interpretation, the Court must give effect to the intent of the parties. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999). The Court presumes the intent of the parties will "reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996). If the plain language does not confer a "definite legal meaning," then the contract is ambiguous. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 219 (2003).

In other words, "[a]mbiguity exists only when a provision at issue is susceptible to more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 120 Ohio St.3d 47, 50 (2008) (citing *Hacker v. Dickman*, 75 Ohio St.3d 118, 119–120 (1996)). The fact that a contract's enforcement will confer hardship on one or both parties is not evidence of ambiguity. *Bondex Int'l*

*Inc. v. Hartford Accident and Indemnification Co.*, 667 F. 3d 669, 677 (6th Cir. 2011) (citing *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority*, 78 Ohio St.3d 353, 362 (1997)).

However, where a contract is ambiguous, the Court may consider extrinsic evidence to determine the parties' intent. *Westfield*, 100 Ohio St.3d at 219 (citing *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St.3d 635, 638 (1992)). The Court may not alter a contract by interpreting extrinsic evidence as contrary to its express terms. *Westfield*, 100 Ohio St.3d at 219 (citing *Blosser v. Enderlin*, 113 Ohio St. 121, 129 (1925) ("there can be no intendment or implication which is inconsistent with an express provision thereof")).

## B. Parties' Arguments Regarding Royalty Calculations

In the instant action, both parties contend the contract is unambiguous regarding the calculation of royalty payments. Defendant argues that "[a] careful yet common sense reading of the relevant provisions" of the Amended Lease indicates that Eclipse may calculate royalties based on the proceeds it receives from a third-party processor. (Def.'s Mot. for Summ. J. at 1). Therefore, Defendant asserts there is no need for "divining the parties' intentions through parole or extrinsic evidence." (*Id.*).

Conversely, Plaintiffs state that "[t]he plain and unambiguous language of the Lease as Amended . . . forbid[s] Eclipse from deducting from Plaintiffs' royalties the costs and expenses of placing the oil, gas, and liquefiable hydrocarbons into marketable condition." (Pls.' Mot. for Summ. J. at 2). According to Plaintiffs, Defendant is expressly prohibited from adjusting royalty payments "directly or indirectly with any expense required to make gas marketable." (*Id.* at 3) (citing Exhibit D & Exhibit F ¶ (e)). The Court will consider the parties' arguments in turn to

6

determine: (1) whether the language of the Amended Lease is unambiguous, and (2) if so, which interpretation is controlling,

To support its contract interpretation, Defendant relies on the definition of "Gross Proceeds" under the Amended Lease's royalty provision. Paragraph (a) of the Amended Lease provides that:

> (a) <u>Percentage</u>. The royalties payable to the Lessor under this Lease shall be on a well by well basis. As to each and every well completed as a producer of oil and/or gas on the leased premises or on lands pooled therewith, the royalties paid to Lessor shall be sixteen and one-half percent (16.5%) of all the oil, gas and casinghead gas and casinghead gasoline removed or recovered from the leased premises or, at Lessor's option (which shall be presumed to be exercised unless Lessor advises Lessee to the contrary prior to any applicable production month) the **Gross Proceeds (as hereinafter defined in paragraph (d))** of the total gross production attributable to the applicable well.

(Exhibit D & F ¶ (a)) (emphasis added). As noted by Defendant, paragraph (d) defines "Gross Proceeds" with the following language:

> (d) <u>Gross Proceeds</u>. For the purpose of this Lease, "Gross Proceeds" means the total consideration paid for the sale of oil, gas, casinghead gas, casinghead gasoline, associated hydrocarbons, and marketable by-products, produced from the leased premises or payments for future production or delivery of production at a future time, or sums paid to compromise claims relating to payment obligations associated with the sale of oil, gas, casinghead gas, casinghead gasoline, associated hydrocarbons, and marketable by-products **with the following exceptions:**
>
> (i) If gas produced from the Leased Premises is processed for the recovery of liquefiable hydrocarbon products prior to sale, and if such processing plant is not owned by Lessee or any Affiliate of Lessee, **Lessor's royalty shall be calculated based upon the consideration paid to Lessee from Lessee's sale of such liquefiable hydrocarbons and residue gas.**

(*Id.* ¶ (d)(i)) (emphasis added).

According to Defendant, subparagraph (d)(i) of the Amended Lease is the "lynchpin for determining how royalties" should be calculated. (Def.'s Mot. for Summ. J. at 7). Focusing its analysis to the last phrase of romanette (i), Defendant argues the Amended Lease requires royalties

on processed wellhead product to be "calculated based upon the consideration paid to Lessee from Lessee's sale of such liquefiable hydrocarbons and residue gas." (Def.'s Opp'n at 3, ECF No. 25) (citing Exhibit D & F ¶ (d)(i)). In other words, Defendant contends that royalties must be computed "based on the money paid to Eclipse for the sale of processed gas to either a processor or other third party." (*Id.*).

Defendant continues by analyzing the plain meaning of "consideration." (Def.'s Mot. for Summ. J. at 7). Relying on the Merriam Webster dictionary definition, Defendant asserts that "consideration" must be interpreted to mean "recompense" or "payment" under the terms of the Amended Lease. (*Id.*). Consequently, Defendant argues "consideration" in subsection (d)(i) refers to "the amount of money Eclipse, as the Lessee, receives from the Processor for the sale of its gas." (*Id.*). In Defendant's view, this monetary payment represents the net costs of processing the raw wellhead product, rather than the gross proceeds from sale to a third-party processor. (*Id.*).

Anticipating Plaintiffs' position, Defendant cites paragraph (e), in which the Amended Lease explicitly addresses the "Costs of Production." (*Id.* at 8). The provision provides as follows:

> (e) <u>Costs of Production</u>. Lessee shall place oil and gas produced from the leased Premises in marketable condition and shall market same as agent for Lessor. **Except as expressly provided in (d) above**, Lessor's royalty shall not be charged directly or indirectly with any expense require to make gas marketable, including but not limited to the following: Expenses of production, gathering, dehydration, compression, manufacturing, processing, treating, transporting or marketing of gas, oil, or any liquefiable hydrocarbons extracted therefrom.

(Exhibit D & F ¶ (e)) (emphasis added). Although Defendant recognizes that paragraph (e) appears to prohibit the adjustment of royalties for production costs, it notes: "[i]n actuality . . . this provision supports Eclipse's method for calculating royalties." (Def.'s Mot. for Summ. J. at 8). By including the language "Except as expressly provided in (d) above," the drafters reinforced the exceptions to the definition of "Gross Proceeds." (*Id.*).

Moreover, Defendant notes that a "contract should be construed to give effect to all of its provisions." (*Id.* at 9) (citing *Eastham v. Chesapeake Appalachia LLC*, 754 F.3d 356, 363 (6th Cir. 2014) ("A contract must be construed in its entirety and in a manner that does not leave any phrase meaningless or surplusage")). Defendant argues that if the drafters intended royalties to be calculated using the gross sales price, it would have been unnecessary to define "Gross Proceeds" or include multiple exceptions. (Def.'s Mot. for Summ. J. at 9). According to Defendant, such a reading would render subsection (d)(i) meaningless. (*Id.* at 9–10).

Plaintiffs argue that Defendant's interpretation of the Amended Lease is improper. Initially, Plaintiffs note that Ohio does not follow a bright-line rule regarding the calculation of royalties in the context of oil and gas leases. (Pls.' Mot. for Summ. J. at 10) (citing *Lutz v. Chesapeake Appalachia, LLC*, 148 Ohio St.3d 524, 527 (2016)). Numerous states have adopted an "at-the-well" rule (permitting the deduction of post-production costs from royalties) or a "marketable product" rule (limiting the deduction of post-production costs). *See Poplar Creek Development Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 238 (6th Cir. 2011) (holding that Kentucky follows the at-the-well rule)); *S Bar B Ranch v. Omimex Canada, Ltd.*, 942 F.Supp.2d 1058, 1062–1063 (D. Montana 2013) (Montana Supreme Court adopted the at-the-well rule)); *Wellman v. Energy Resources, Inc.*, 210 W.Va. 200, 211 (2001) (Supreme Court of Appeals of West Virginia held that "unless the lease provides otherwise, the lessee must bear all costs incurred in" processing the raw product)).

However, in *Lutz*, the Ohio Supreme Court declined to adopt a bright-line test, instead holding that Ohio oil and gas leases are subject to traditional rules of contract construction. *Lutz*, 148 Ohio St.3d at 527. Because "the rights and remedies of the parties are controlled by the specific language of their lease agreement," the *Lutz* court did not invoke the "at-the-well" or

"marketable product" rule. *Id.* Therefore, the parties' intent determines the calculation of royalties in Ohio—not a predetermined legal rule. *Id.*

Accordingly, Plaintiffs argue the Court must deduce the correct royalty calculation procedures through the express terms of the Amended Lease. (Pls.' Mot. for Summ. J. at 10). Citing paragraph (e), the "Costs of Production," Plaintiffs contend "[t]here is no other provision that speaks more directly on the issue Eclipse's obligations" to bear the costs associated with raw material processing. (Pls.' Mot. for Summ. J. at 9). Specifically, Plaintiffs point out that the Amended Lease states: "Lessee shall place oil and gas produced from the leased premises in marketable condition and shall market same as agent for Lessor." (Exhibit D & F ¶ (e)).

Plaintiffs assert that "marketable condition" is a term of art in the oil and gas industry. (Pls.' Mot. for Summ. J. at 13). As noted by Plaintiffs, "[n]atural gas must generally be treated or processed—to remove waste products" before it can be marketed as a commodity. *Abraham v. WPX Production Productions, LLC*, 317 F.R.D. 169, 177 (D. New Mexico 2016.). Plaintiffs contend that natural gas extracted from the Utica and Marcellus Shale regions—which include Guernsey County, Ohio—is typically "wet gas." *Kinder Morgan Cochin LLC v. Simonson*, 66 N.E.3d 1176, 1178 (Ohio Ct. App. 2016). This raw wellhead product must be processed into "dry gas" or liquefiable hydrocarbons before it is in marketable condition. (Pls.' Mot. for Summ. J. at 15) (citing *Carter v. Exxon Corp.*, 842 S.W.2d 393, 395 (Tex. App. 1992)). Thus, Plaintiffs contend the language of paragraph (e) requires Defendant to convert extracted wet gas into marketable dry gas and liquefiable hydrocarbons before sale. (Pls.' Mot. for Summ. J. at 15).

Moreover, Plaintiffs argue the Amended Lease requires Defendant to bear the costs and expenses of this processing. (*Id.* at 16). In particular, Plaintiffs note that the second sentence of paragraph (e) expressly prohibits Defendant from charging royalties:

10

*directly or indirectly* with any expense required to make gas marketable, including but not limited to the following: Expenses of production, gathering, dehydration, compression, manufacturing, processing, treating, transporting or marketing of gas, oil, *or any liquefiable hydrocarbons extracted therefrom*.

(*Id.*) (citing Exhibit D & F ¶ (e)). Because the drafters included the language "extracted therefrom," Plaintiffs assert that paragraph (e) specifically bars Defendant from charging Plaintiffs any costs "associated with services performed subsequent to the gas leaving the wellhead—including the cost of processing." (*Id.* at 17).

Plaintiffs also point out the inclusion of subparagraphs (d)(ii) and (d)(iii) suggests that Defendant is expected to internalize all processing costs. (Pls. Mot. for Summ. J. at 24–25). Subparagraph (d)(ii) protects Plaintiffs from potential "price manipulation caused by Eclipse's decision to process the wet gas in its own facility." (*Id.* at 24). Plaintiffs interpret the provision to ensure that Defendant "cannot artificially lower the basis for calculating Plaintiffs' royalties by undervaluing the liquefiable hydrocarbons and dry gas on less than arm's-length terms to an affiliate." (*Id.* at 24–25). Similarly, Plaintiffs contend that subparagraph (d)(iii), which shields Plaintiffs' royalties from losses incurred due to Defendant's poor processing decisions, also indicates that royalties cannot be lowered by processing costs. (*Id.* at 25).

Despite their assertions, Plaintiffs acknowledge there is one "qualification on Eclipse's obligation to cover all costs and expenses with making the oil and gas marketable." (Pls.' Mot. for Summ. J. at 18). According to Plaintiffs, subparagraph (d)(iv) permits Defendant to reduce royalty payments in the event it settles with a third-party for a breach of contract related to processing. (*Id.*).

However, Plaintiffs reject Defendant's reading of the paragraph (d) and subparagraph (d)(i). Addressing Defendant's interpretation of "Gross Proceeds," Plaintiffs contend that paragraph (d) is a "landowner-friendly provision that does not authorize Eclipse to deduct any

11

expenses." (*Id.* at 19). Plaintiffs emphasize the term "total consideration" in paragraph (d), arguing that "consideration" encompasses more than monetary payment. (*Id.* at 20) (Exhibit D & F ¶ (d)). Citing Black's Law Dictionary, Plaintiffs defines "consideration" as:

> The inducement to a contract. The cause, motive, price, or impelling influence which induces a contracting party to enter into a contract. The reason or material cause of a contract. Some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other.

(Pls.' Mot. for Summ. J. at 20) (citing Black's Law Dictionary, 211 (6th ed. 1991)).

In addition, Plaintiffs cite several cases which define consideration as "either a detriment to the promisee or a benefit to the promisor." *Lake Land Employment Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 247 (2004) (citing *Irwin v. Lombard University*, 56 Ohio St. 9, 19 (1897)); *see also Minster Farmers' Cooperative Exchange Co. v. Meyer*, 117 Ohio St.3d 459 (2008). Plaintiffs also offer a provision of the Ohio Uniform Commercial Code in support of their interpretation. (Pls.' Mot. for Summ. J. at 21). Under O.R.C. § 1302.03(A), "[a] contract for the sale of minerals of the like, including oil and gas, or a structure or its materials to be removed from realty is a contract for the sale of goods within sections 1302.01 to 1302.98 of the Revised Code." Section 1302.17 of the Ohio Revised Code indicates the price for a sale of goods "can be made payable in money or otherwise."

Consequently, Plaintiffs argue the Amended Lease "contemplates that 'Gross Proceeds' includes all value received by Eclipse." (Pls. Mot. for Summ. J. at 22). When read together with paragraph (e), Plaintiffs suggest that paragraph (d) requires Defendant to calculate royalties based on the total consideration obtained by Defendant for the sale of "wet gas." (*Id.*). To Plaintiffs, any services received by Defendant from a third-party processor constitute a benefit—and therefore consideration within the meaning of the Amended Lease. (*Id.*).

12

Moreover, Plaintiffs contend that subparagraph (d)(i) does not support Defendant's position. Although the text provides that: "Lessor's royalty shall be calculated based upon the consideration paid to Lessee from Lessee's sale of such liquefiable hydrocarbons and residue gas," Plaintiffs argue the provision merely addresses timing. (*Id.* at 23). According to Plaintiffs, subparagraph (d) "dictates when royalties are to be calculated." (Pls.' Reply at 9). Thus, Plaintiffs assert that (d)(i-iii) are "exceptions to when royalties are to be calculated under paragraph (d), not exceptions to the rule that royalties are to be calculated based upon consideration." (*Id.*). In other words, if Defendant processes wet gas into marketable dry gas and liquefiable hydrocarbons prior to sale, Plaintiffs argue that (d)(i) entitles them to royalties on both the processed dry gas and the separated liquefiable hydrocarbons. (*Id.* at 24).

Plaintiffs also aver that interpreting paragraph (d) to permit net royalty calculations would render the royalty provisions of the Amended Lease superfluous. (Pls.' Mot. for Summ. J. at 27). The Court must "generally seek to avoid interpreting contracts to contain superfluous words." (*Id.*) (citing *Filicky v. American Energy–Utica, LLC*, 645 Fed.App'x 393, 398 (6th Cir. 2016)). Furthermore, when interpreting a contract:

> courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give another construction that would give it meaning and purpose, then the latter construction *must* obtain.

(Pls.' Mot. for Summ. J. at 27 n.5) (citing *State v. Bethel*, 110 Ohio St.3d 416, 423 (2006)).

Here, Plaintiffs note that the original lease contained a net royalty provision. (Pls.' Mot. for Summ. J. at 27). Specifically, the lease stated:

> (B) ROYALTY: To pay Lessor as Royalty, less all applicable taxes, assessments, and adjustments on production from the Leasehold, as follows:

13

1. OIL: To deliver to the credit of Lessor, free of cost, a royalty of the equal one-eight part of all oil and any constituents thereof produced and marketed from the Leasehold.

2. GAS: To pay Lessor an amount equal to one-eighth of the net proceeds realized by Lessee from the sale of all gas and the constituents thereof produced and marketed from the Leasehold. Lessee may withhold Royalty payment until such time as the total withheld exceeds twenty-five dollars ($25.00).

(*Id.* at 27–28) (citing Exhibit A ¶ (5)(B)). In Plaintiffs' view, the original lease clearly called for a net royalty calculation—permitting Defendant to deduct the costs of processing raw materials into marketable product. (Pls.' Mot. for Summ. J. at 28). Because the Amended Lease "supplanted and drastically modified" the original lease, Plaintiffs contend the amendments converted a net royalty lease to a gross royalty lease. (*Id.*). Accordingly, Plaintiffs suggest the Court must interpret the Amended Lease to require gross royalty calculations in order to give proper effect to the Shanesville and Graber Amendments. (*Id.*).

Finally, Plaintiffs aver that implied covenants impose additional obligations on the parties outside the express terms of the Amended Lease. (*Id.* at 11). Plaintiffs cite *Alford v. Collins-McGregor Operating Co.*, 2016 WL 3981034, at *3 (Ohio Ct. App, July 15, 2016), in which the court noted that "[s]ince the 1800s, [Ohio] courts have recognized the existence of implied covenants in oil and gas leases." For example, the implied covenant of good faith and fair dealing requires reasonableness in the enforcement of the contract and emphasizes "consistency with the justified expectations of the other party." *Yoder v. Artex Oil Co.*, 2014 WL 6467477, at *8 (Ohio Ct. App., Nov. 13, 2014) (quoting Restatement (Second) of Contracts § 205 (Am. Law Inst. 1981)). Plaintiffs further point out that, in the context of oil and gas contracts, the implied covenants impose a duty "to conduct all operations that affect the lessor's royalty interest with reasonable care and due diligence." (Pls.' Mot. for Summ. J. at 11) (citing *Rudolph v. Viking Int'l Resources Co.*, 84 N.E. 3d 1066, 1082 (Ohio Ct. App. 2017)).

14

## C. Court's Analysis Regarding Royalty Calculations

First, the Court notes that Ohio does not follow a bright-line "at-the-well" or "marketable product" rule regarding the calculation of royalties in oil and gas leases. *Lutz*, 148 Ohio St.3d at 527. As correctly stated by Plaintiffs, the Court must interpret the royalty provisions of the Amended Lease through traditional rules of contract construction. *Id.* Moreover, the parties' dispute does not involve the term "at-the-well." Therefore, the Court may not base its analysis on the interpretation of a single term of art. Rather, the Court must holistically consider the four corners of the Amended Lease.

### 1. Interpretation of Paragraph (d)

The Court agrees with Defendant's reading of paragraph (d). Although paragraph (d) defines "Gross Proceeds" as the "total consideration" paid for the sale of raw wellhead product, Defendant accurately notes the paragraph concludes by stating: ". . . **with the following exceptions:**" (Exhibit D & F ¶ (d)) (emphasis added). Plaintiffs' assertions that "total consideration" encompasses more than monetary payment, although well taken, do not contradict Defendant's interpretation of paragraph (d).

Indeed, Plaintiffs properly defined "consideration" by citing its legal meaning, or "[s]ome right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." Black's Law Dictionary, 211 (6th ed. 1991). While terms of a contract are traditionally afforded their plain meaning, "[t]erms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong." *Moran v. Prather*, 90 U.S. 492, 497 (1874); *see also Tooling, Manufacturing and Technologies Association v. Hartford Fire Insurance Co.*, 693 F.3d 665, 673 (6th Cir. 2012) ("[w]hen considering a word or phrase that has not been given prior legal

meaning, resort to a lay dictionary such as Webster's is appropriate") (citing *Citizens Insurance Co., v. Pro-Seal Service Group, Inc.*, 477 Mich. 75, 84 (2007)).

However, Plaintiffs depart from a reasonable interpretation of paragraph (d) when they ignore the exclusionary language in the last phrase: "**. . . with the following exceptions:**" (Exhibit D & F ¶ (d)) (emphasis added). In its Opposition, Defendant accurately states there is no "cogent rationale for reading the word 'exception' not to mean 'exception.'" (Def.'s Opp'n at 9) (citing *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 405 (2011) ("Common, undefined words appearing in a contract 'will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the agreement").

Here, the Amended Lease does not define the term "exception." Nor is "exception a term of art which should be afforded special legal meaning. Applying the plain meaning of the word, the drafters intended to carve out exceptions to the general rule in paragraph (d). Accordingly, this Court finds the parties did not intend for royalty calculations to be exclusively computed based on the "total consideration" received. Finding no ambiguity in paragraph (d), the Court turns to the disputed interpretation of subparagraphs (d)(i-iii).

### 2. Interpretation of Subparagraphs (d)(i-iii)

Subparagraph (d)(i) reads as follows:

(i) If gas produced from the Leased Premises is processed for the recovery of liquefiable hydrocarbon products prior to sale, and if such processing plant is not owned by Lessee or any Affiliate of Lessee, **Lessor's royalty shall be calculated based upon the consideration paid to Lessee from Lessee's sale of such liquefiable hydrocarbons and residue gas.**

(Exhibit D & F ¶ (d)(i)) (emphasis added).

The first phrase of subparagraph (d)(i), "[i]f gas produced from the Leased Premises is processed . . .," clearly indicates the parties intended to address the effects of processing on royalty calculations. The Court agrees with Defendant's characterization of subparagraph (d)(i) as the "lynchpin" of royalty calculations. Yet the parties disagree on the meaning of the phrase "consideration paid to Lessee." Defendant again invokes the ordinary meaning of "consideration," citing the Merriam Webster Dictionary. (Def.'s Mot. for Summ. J. at 7). Furthermore, Defendant argues the "[r]eceipt of money for the sale of processed gas fits squarely with the ordinary meaning of the word 'paid.'" (Def.'s Opp'n at 7). In sum, Defendant contends "one normally *pays for* services rather than receiving services *as pay* absent an express agreement to the contrary." (*Id.*). Relying on Black's Law Dictionary, Plaintiffs construe "consideration paid to Lessee" to include the value of the services necessary to make raw wellhead materials marketable. (Pls.' Opp'n at 6).

Ohio courts hold that "[a]mbiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991). *See, e.g., Wells v. American Electric Power Co.*, 48 Ohio App.3d 95, (1988). Not every "inconsistency or disagreement" renders a contract ambiguous. *Journey Acquisition-II, L.P. v. EQT Production Co.*, 830 F.3d 444, 452 (2016) (citing *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003)). However, under the *contra-proferentem* canon, an ambiguous contractual term should be construed against the party that drafted it. *Journey*, 830 F.3d at 455.

Before concluding whether the term "consideration paid" is ambiguous, the Court must review the four corners of the Amended Lease for interpretative clues. As stated by this Court, "the Court's construction of the [oil and gas] lease should attempt to harmonize all provision[s] of the document, and should not dismiss any provision as inconsistent [i]f there exists a reasonable

interpretation that gives effect to both. *Cameron v. Hess Corp.*, 974 F.Supp.2d 1042, 1054 (S.D. Ohio 2013) (citing *Farmers' National Bank v. Delaware Insurance Co.*, 83 Ohio St. 309 (1911); *see also Expanded Metal Fireproofing Co. v. Noel Construction Co.*, 87 Ohio St. 428, 434 (1913) ("[n]o provision of a contract is to be disregarded as inconsistent with other provisions, unless no other reasonable construction is possible").

In the case *sub judice*, the structure of the Amended Lease provides insight to the parties' intent. By including subparagraphs (d)(i-iv) as exceptions to the general rule, the drafters highlighted these provisions as distinct or only applicable in certain circumstances. Plaintiffs' legal definition of "consideration" is well taken. However, construing "consideration paid" as both the price of the raw materials and the value of the processing services would erase any meaningful distinction between paragraph (d) and subparagraph (d)(i). The Court has already acknowledged "total consideration" to mean the entire benefit to the promise or detriment to the promisor (i.e., monetary and otherwise). Subparagraph (d)(i) is reasonably interpreted as an exception to this general rule where Defendant sells the raw wellhead product to a third-party processor.

Plaintiffs' contention that subparagraph (d)(i) merely refers to the timing of royalty calculations is not well taken. On the face of its language, subparagraph (d)(i) has nothing to do with timing. If, as Plaintiffs assert, subparagraph (d)(i) means that royalties should be calculated after processing but without cost deductions, then paragraph (d) would be sufficient. If the drafters intended that royalties be calculated for wet gas and liquefiable hydrocarbons separately, again without cost deductions, then paragraph (d) would still be sufficient. As indicated in its Opposition, Defendant "does not dispute that Plaintiffs are entitled to a royalty from the sale of all produced hydrocarbons, whether the gas is sold as a raw wellhead product or after processing into

18

constituent parts." (Def.'s Opp'n at 4). Because royalty calculations on constituent parts are already required by paragraphs (a) and (b), "there would be no reason to repeat the same requirements" in subparagraph (d)(i). (*Id.*).

Moreover, by characterizing subparagraph (d)(i) as merely providing "the option to process the 'wet gas' into 'dry gas' prior to sale," Plaintiffs undercut their own argument regarding paragraph (e). (Pls.' Mot. for Summ. J. at 23). Plaintiffs contend paragraph (e) requires Defendant to place oil, gas, and liquefiable hydrocarbons into marketable form prior to sale. (*Id.* at 15). In addition, Plaintiffs argue that dry gas and separated hydrocarbons must be processed before they are in marketable condition. (*Id.*). Accordingly, Plaintiffs' assertion that subparagraph (d)(i) "gives Eclipse the ability to process" raw wellhead product contradicts its position that paragraph (e) mandates processing. In order to harmonize all provisions of the Amended Lease, the Court must not construe subparagraph (d)(i) as inconsistent with paragraph (e) if another reasonable interpretation exists. *Cameron*, 974 F.Supp.2d at 1054.

Finally, Defendant's reliance on the ordinary meaning of the word "paid" is well taken. True, "consideration" should be accorded its legal meaning. *Moran*, 90 U.S. at 497. However, the word "paid" is not a term of art and should be given its ordinary meaning. *Sunoco*, 129 Ohio St.3d at 405. Defendant cites Merriam Webster's Dictionary, which defines the root word "pay" as: "to make due return to for services rendered or property delivered; to engage for money; to give in return for goods or service; to discharged indebtedness; to make a disposal or transfer (of money)." (Def.'s Opp'n at 6). Defendant argues the receipt of services does not traditionally fall within the ordinary meaning of "paid." (*Id.*). Rather, payment in the form of services is typically agreed upon between the parties. (*Id.*). Consequently, Defendant suggests the words "consideration paid" solely refers to a monetary payment for the sale of raw wellhead materials.

The Court agrees. By modifying the term "consideration" with the adjective "paid," the drafters indicated that "consideration paid" should be construed differently than "total consideration." Had the parties intended "paid" to include the value of processing services, subparagraph (d)(i) would have said so. Furthermore, the Court agrees with Defendant that the drafters "would presumably have identified a methodology to monetize the value of those services" in the Amended Lease. (*Id.* at 8). They did not. Taking into account the four corners of the Amended Lease, the Court interprets subparagraph (d)(i) to be an exception to the calculation of royalties based on gross proceeds.

Plaintiffs' arguments regarding subparagraphs (d)(ii-iii) are also unpersuasive. In fact, both provisions support Defendant's reading of paragraph (d). By shielding Plaintiffs from price manipulation caused by Defendant's decision to process wet gas at its own facility, subparagraph (d)(ii) acknowledges that Defendant is expected to deduct the costs of processing from its royalty calculations. If Defendant could not deduct these processing costs, then Plaintiffs would not be vulnerable to price manipulation in processing. A royalty calculation based on gross proceeds is unaffected by processing costs. However, a royalty calculation based on net proceeds could be manipulated down by unreasonably high processing cost deductions. The same logic applies to subparagraph (d)(iii), which protects Plaintiffs' royalties from losses incurred by Defendant's poor processing decisions.

Consequently, the Court finds no ambiguity in subparagraphs (d)(i-iii). Giving effect to all provisions of the Amended Lease, Defendant's position is the only reasonable interpretation.

### 3. Interpretation of Paragraph (e)

Next, the Court considers whether paragraph (e) is ambiguous. As discussed *supra*, paragraph (e) reads as follows:

> (e) <u>Costs of Production</u>. Lessee shall place oil and gas produced from the leased Premises in marketable condition and shall market same as agent for Lessor. **Except as expressly provided in (d) above,** Lessor's royalty shall not be charged directly or indirectly with any expense require to make gas marketable, including but not limited to the following: Expenses of production, gathering, dehydration, compression, manufacturing, processing, treating, transporting or marketing of gas, oil, or any liquefiable hydrocarbons extracted therefrom.

(Exhibit D & F ¶ (e)) (emphasis added).

In their Opposition, Plaintiffs argue the language of paragraph (d)(i) "can hardly be said to be an 'expressly provided for' exception to the default rule." (Pls.' Opp'n at 6). Plaintiffs continue by stating their interpretation does not ignore the exception to paragraph (e). (*Id.* at 7). Specifically, Plaintiffs contend that subparagraph (d)(iv) is the only provision in paragraph (d) which "expressly provides for" the deduction of processing costs. (*Id.* at 8). According to Plaintiffs, this (d)(iv) exception is the language referenced in paragraph (e)—rendering each provision of paragraphs (d) and (e) meaningful. (*Id.* at 8–9).

Defendant rejects this argument, contending that Plaintiffs' interpretation creates unnecessary inconsistency and renders subparagraphs (d)(i-iii) superfluous. (Def.'s Opp'n at 4). Thus, Defendant suggests "[p]aragraph (d) and its subparagraphs simply identify a list of circumstances that serve as exceptions to the prohibition in paragraph (e) against charging the costs of processing against the lessor's royalty." (*Id.*).

This Court agrees. If the exception language in paragraph (e) only references a single exception in subparagraph (d)(iv), then subparagraphs (d)(i-iii) are meaningless. Such an interpretation ignores the fact that "the meaning of a contract is to be gathered from a consideration of all its parts." *Karabin v. State Automobile Mutual Insurance Co.*, 10 Ohio St.3d 163, 167 (1984). In addition, paragraph (d) expressly identifies subparagraphs (d)(i-iv) as exceptions to the

rule against net royalty calculations by stating: **"with the following exceptions"** plural. (Exhibit D & F ¶ (d)) (emphasis added).

Subparagraphs (d)(i-iii) all begin with the word "if," indicating that each romanette provides an exception to gross royalty calculations in a specific circumstance. Romanette (i) expressly provides for net royalty calculation by stating that, if the extracted gas is processed, "Lessor's royalty shall be calculated based upon the consideration paid to Lessee from Lessee's sale of such liquefiable hydrocarbons and residue gas." (Exhibit D & F ¶ (d)(i)). Romanettes (ii) and (iii) expressly provide that, if the extracted gas is processed, royalty calculations will never be arbitrarily lowered by an interested processor or a poor processing decision. (Exhibit D & F ¶ (d)(ii-iii)). Because all three provisions highlight a specific circumstance in which gross proceed royalty calculations will not apply, they expressly provide for exceptions to paragraph (e).

Accordingly, paragraph (e) is unambiguous. Because Plaintiffs' reading renders several provisions superfluous, Defendant's reading is the only reasonable interpretation.

### 4. Effect of Royalty Provisions in Original Lease

Plaintiffs further contend the drafters' intent regarding the Amended Lease may be gleaned by examining the original lease. (Pls.' Reply at 11). Plaintiffs cite portions of the original lease (Exhibit A), where the royalty provisions expressly provided for net royalty calculations. (Pls.' Mot. for Summ. J. at 27–28). According to Plaintiffs, the lease amendments "supplanted and drastically modified the original royalty provision of the Lease as Amended, converting the Lease from a net royalty lease to a gross royalty lease." (*Id.* at 28). In their view, ignoring these changes would render the amendment to the royalty provision superfluous. (*Id.*).

Defendant argues the amendments did not convert the lease from a "net royalty" to a "gross royalty" lease because the Amended Lease does not require gross royalty calculations in every

circumstance (i.e., exceptions in subparagraphs (d)(i-iv)). (Def.'s Opp'n at 11). Moreover, Defendant characterizes Plaintiffs' argument as "untenable" because the 2014 amendments altered the original lease in multiple ways. (*Id.*). In addition to revising the royalty provisions, the lease amendments extended the primary lease term and added 13 additional sections. (*Id.*).

For purposes of resolving the present dispute, the Court declines to consider the royalty provisions of the original lease. As held by the Supreme Court, "[l]eases, like deeds or other written instruments, must receive a reasonable construction, as derived from the language employed without the aid of extrinsic evidence." *Bradley v. United States*, 98 U.S. 104, 105 (1878). Only where the Court "cannot decipher the plain language of the contract" may the fact-finder consider extrinsic evidence to ascertain the parties' intent. *Kenney v. Chesapeake Appalachia*, LLC, 31 N.E.3d 136, 141 (Ohio App. Ct. 2015) (citing *Westfield*, 100 Ohio St.3d at 219). Here, the royalty provisions of the Amended Lease are unambiguous. Moreover, the lease amendments contain the following language:

> If any of the above stated provisions in this Amendment conflict with or are inconsistent with the printed provisions or terms of the Lease, the above stated provisions in this Amendment shall control.

(Exhibit D & F).

Accordingly, the royalty provisions in the Shanesville and Graber Amendments reflect the parties' final and complete agreement regarding the calculation of royalties. Under the parol evidence rule, "absent fraud, mistake, or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." *Glazer v. Lehman Brothers, Inc.*, 394 F.3d 444, 455 (6th Cir. 2005) (citing *Galmish v. Cicchini*, 90 Ohio St.3d 22,

27 (2000)).  Because the amended royalty provisions supersede any past agreements, the royalty provisions in the original lease are properly excluded as parol evidence.

### 5. Implied Covenants

Finally, the Court declines to analyze Plaintiffs' arguments regarding implied covenants at this stage.  Although several implied covenants apply in the context of oil and gas leases, these covenants do not alter the Amended Lease's express terms.  Since the parties filed cross motions for summary judgment seeking a declaration of the proper calculation of royalties, the Court will not conduct analysis beyond the four corners of the Amended Lease.

### IV.

Pursuant to the general rule in paragraph (e), the Court finds that royalties are calculated using gross proceeds under the terms of the Amended Lease.  However, where gas is processed for the recovery of liquefiable hydrocarbon products prior to sale, production costs are deductible under subparagraph (d)(i).  Consequently, the Court **GRANTS** Defendant's Motion for Partial Summary Judgment (ECF No. 20) and **DENIES** Plaintiffs' Motion for Partial Summary Judgment (ECF No. 22) in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

12-14-2018
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**